1
2
3
4   Attorneys for Defendant                    Attorney for Plaintiff
5
6
7   Depatment of Justice                       Edwin Cohens,Pro Se
8   450 Golden Gate Avenue,Box 36055           P.O. Box 548
9   San francisco,California  9th Fl.          Oakland,CA 94604
10  415-436-6813                               510-282-6490
11
12
13                                           FILED
14
15
16              UNITED STATES DISTRICT COURT        JUN 2 9 2016
17
18          NORTHERN DISTRICT OF CALIFORNIA         SUSAN Y. SOONG
19                                              CLERK, U.S. DISTRICT COURT
                                               NORTHERN DISTRICT OF CALIFORNIA
20              SAN FRANCISCO DIVISION                  OAKLAND
21
22
23                                           C16- 3665
24  EDWIN J. COHENS,                         FOIA REQUEST
25                                           UNDER FREEDOM of
26     Plaintiff,                            INFORMATION ACT
27
28                                           6-26-16
29
30     v.
31
32
33
34  UNITED STATES FEDERAL
35  BUREAU of INVESTIGATION (FBI)
36
37
38
39     In pursuant of FOIA , 5 U.S.C sec. 552 *et seq*., the Department of Defense
40
41  implementing regulations, 32 C.F.R. sec.286.1 *et seq*., the Department of
42
43  Justice implementing regulations, 28 C.F.R. sec.16.1 *et seq.,*the Department
44
45  of State implementing regulations, 22 C.F.R. sec.171.1 *et seq.,*the Central
46
47  Intelligence Agency implementing regulations, 32 C.F.R. sec. 1900.01 *et seq*
48
49  and the President's Memorandum of January 21,2009,74 Fed. Reg. 4683
50
51  (Jan.26 2009) and the Attorney General's Memorandum of March 19,2009
52

1
2  (con't) ,74 Fed. Reg. 49892 (Sept 29,2009)
3
4      The Plaintiff intends to educate the public about the civil liberties
5
6 implications of the American Government involved in the torture of an
7
8 American citizen.
9
10
11                   **I.  Requested Records**
12
13
14    The Plaintiff seeks the release of all records the F.B.I. are in
15
16 possession of that involve the plaintiff Edwin Cohens,Edwin J. Cohens
17
18 Edwin Jay Cohens,Edward Cohens,Eddie Cohens or any other code
19
20 names the F.B. I. may have used.
21
22
23
24
25          • What Statutory Law did the FBI/Justice Department use to justify
26
27   the torture of an American citizen on American soil?
28
29
30
31          •What part did the Alameda County Sheriff Dept of Alameda County,
32
33CA have in this torture,as well as the Oakland Police Dept of Oakland,CA,
34
35 and the Emeryville Police dept of Emeryville,CA.? What private contractors
36
37 did you use in this torture?
38
39
40      • What is the name of the electronic device that you used to burn the
41
42    plantiff's penis,anus and testicles?Who is the manufacturer?
43
44
45      • What is the name of the of the device you use for sleep deprivation of
46
47 the plaintiff? Who is the manufacturer?
48

1
2 •What is the plaintiff's FISA case#? What Justice Department official
3
4 filed it?
5
6     The plaintiff has a partial list of the people used as snitches/informants
7
8    against him,what information did the following people provide?
9
10  • Eirk Hereford....blk male,little person may be 3' tall.Long time snitch,even
11
12 told the plaintiff he worked for Alameda County Sheriff Dept. Filed a phony
13
14 termporary restraining order against the plaintiff(case #RG13671562).
15
16Collects cans for money and lives at 3501 San Pablo,Oakland.
17
18
19 •Willie Doe, blk male,greying features in wheelchair sometimes,with
20
21brown felt cowboy hat.Drugs.3501 san Pablo,Oakland
22
23
24 •2 Blk males, both light complextion.One tall with round head and brown
25
26leather hightop shoes. When building was going through sale, he was getting
27
28signatures from residents for attorney. May have done something with
29
30 plaintiff's signature on something.The other guy was short.
31
32
33 •Jesse Doe,blk male tall with missing teeth in front.Tried to set the plaintiff up on
34
35a drug bust. Moved out of 3501 San Pablo,Oakland
36
37
38
39  • Cory Doe.Blk male 60ish,grey hair.Walks stiff like. Lives at 3501 San
40
41Pablo,Oakland,CA
42
43
44  • Jane Doe,Hispanic female,60ish 5 ft. tall with cane.Grey hair.
45
46     Lives at 3501 San Pablo,Oakland,CA
47

1
2      Loenard...Hispanic male 50ish 5'8" 180 may be a swown police officer
3
4 and recruiter.Puts alcohol on his breath and pretends to be drunk to get you let
5
6   your guard down while he asked you questions.
7
8
9      Eddie blk male 50s,stainded buck teeth
10
11
12 John Doe....white male ,lived on fifth floor.Skin was weather beaten and he
13
14 drinks.
15
16
17      John Doe,......blk male 5'9" 180,worked as custodian while building
18
19 was being renovated.Black hair with jheri curl hair style.
21
22
23
24      As mentioned before,this is a partial list, there are a lot of complete
25
26 strangers,dressed in Middle-eastern cloths constanly trying to start up
27
28 conversations with the plaintiff. He ignored them, which seems to make
29
30 the FBI mad. They became angry because the plaintiff shows no interest
31
32 in hurting people.
33
34      The following article was taken from the online blog,The Intercept,
35
36 and it explained what it's like to be on a watchlist, having people
37
39 constanly trying get you to hurt people
40
41
41
42
43
44
45
46
47
48

4,

# THE FBI INFORMANT WHO MOUNTED A STING OPERATION AGAINST THE FBI

**BY TREVOR AARONSON**                                        04/15/2015



When you're introduced to Saeed Torres in the new documentary *(T)ERROR*, you hear him bickering with the filmmaker, Lyric Cabral. The screen is black.

"I told you I didn't want my face in that shit," he says.

"Even if your face is shown, how would somebody come after you?" Cabral asks.

"You'd be surprised who knows me," Torres insists.

The blackness lifts. Torres is dressed in a chef's apron and a white headscarf, making hot

file:///C:/Users/dee/Documents/The%20FBI%20Informant%20Who%20Mounted%20a%2...   9/14/2015

Case 4:16-cv-03665-KAW   Document 1   Filed 06/29/16   Page 6 of 25

dogs at an amateur basketball game, as if he were an all-American guy.

"I might not even make no fucking independent film," he says, irritated.

Torres isn't an all-American guy. He's an FBI informant, one of more than 15,000 domestic spies who make up the largest surveillance network ever created in the United States. During J. Edgar Hoover's COINTELPRO operations, the bureau had just 1,500 informants. The drug war brought that number up to about 6,000. After 9/11, the bureau recruited so many new informants — many of them crooks and convicts, desperate for money or leniency on previous crimes — that the government had to develop software to help agents track their spies.

Torres agreed to participate in that independent film, of course. In *(T)ERROR*, which has its New York premiere at the Tribeca Film Festival on April 16, he offers the rest of us an unprecedented look inside an FBI counterterrorism sting as it unfolds. The documentary is compelling for its intimate portrayal of a single informant who has played a key role in several major terrorism cases.

*Video clip from (T)ERROR*

6

Informants represent the manpower behind the FBI's controversial stings, which are intended to find would-be terrorists *before* they attack. In the decade after 9/11, 158 defendants were prosecuted following these undercover operations, which are usually led by an informant and provide the means and opportunity for someone to attempt to commit an act of terrorism. A Human Rights Watch report in 2014 criticized the FBI for targeting "particularly vulnerable people, including those with intellectual and mental disabilities and the indigent." Late last week, for example, the FBI arrested a mentally troubled 20-year-old in Topeka, Kansas, after he allegedly attempted to bomb Fort Riley with the help of two undercover FBI informants.

While there are more than 15,000 FBI informants, most are low-level operatives who provide scraps of information or tips about people in their community. Only a few of them at any time are high-level operators like Torres — professional liars who travel the country as *agents provocateur* in elaborate stings. They can make $100,000 or more for every case they work. Torres, a former Black Panther and convict who robbed New York City transit booths, is one of these operators, a freelance agent who portrays himself as a "radicalized Muslim," as the government's terminology puts it.

"I don't like the word informant," Torres says in *(T)ERROR*. "I consider myself a civilian operative."

Torres was the informant behind FBI stings that targeted Tarik Shah, a Bronx jazz bassist who was convicted of providing material support for terrorists in 2007, after he pledged allegiance to Al Qaeda in front of an undercover agent, and Mohammed Ali Hassan al-Moayad, a Yemeni cleric in Brooklyn who bragged about his connections to Osama bin Laden. Al-Moayad pleaded guilty to conspiring to raise money for Hamas, and after he served six years behind bars, an appeals court overturned his conviction, ruling that he did not receive a fair trial. He then was deported to Yemen, where he received a hero's welcome. Shah is in federal prison, serving a 15-year sentence.

*(T)ERROR* picks up Torres's story after these stings (warning to readers: spoilers ahead). Living in a rundown apartment somewhere in the Northeast, he gets a call from the FBI. They want him to go to Pittsburgh to get to know a terrorism suspect — a 34-year-old white Muslim convert named Khalifah al-Akili.

"I need the money," Torres tells Cabral and her filmmaking partner, David Felix Sutcliffe.

He packs up his car and his dog and moves into an FBI safe house around the corner from al-Akili's apartment building. The cameras follow Torres for months as he struggles to gather *any* evidence that al-Akili poses a threat to national security. One of the remarkable aspects of this documentary — and of the way the FBI conducts its stings — is that Torres flatly admits that the target of his FBI operation isn't dangerous. He isn't on his way to becoming a terrorist.

"That dude ain't going to bust a grape," Torres tells his FBI handler in a phone conversation. "He ain't going to throw rice at a wedding, believe me."



And here's where *(T)ERROR* brings viewers into a previously unseen world — as the FBI sting unravels.

The agents, apparently frustrated that Torres couldn't build a case on al-Akili, bring in a second informant, Shahed Hussain, and tell Torres to make the introduction. Hussain is a con artist from Albany, New York, who was convicted of participating in a scam to give driver's licenses to undocumented immigrants. He came to the U.S. from Pakistan in 1994, after being arrested in Karachi on a murder charge. Hussain had been used by the FBI before — he was the bureau's undercover informant in an Albany terrorism case as well as in a sting that targeted the so-called Newburgh Four — four poor black men who plotted with Hussain to bomb synagogues in the Bronx and to fire Stinger missiles at airplanes,



though only after Hussain had offered the lead defendant, a mentally troubled man named James Cromitie, $250,000 if he participated in the plot. (The four suspects received lengthy prison sentences.)

There's no shortage of embarrassing moments for the FBI in its dozens of counterterrorism stings since 9/11. In Boston, an FBI informant who was working a counterterrorism case was caught on an FBI camera purchasing heroin, which wasn't part of his assignment. In case after case, the FBI experiences so-called "recorder malfunctions" — usually at the most unfortunate time for the defendant, such as at the very beginning of the sting or, as in an operation involving a Baltimore teenager, when the target was attempting to back out of the plot. More recently, FBI agents accidentally recorded themselves calling the subject of their undercover investigation a "retarded fool" whose terrorist ambitions were "wishy-washy."

As soon as Hussain is introduced into the al-Akili case, the FBI's work is revealed as similarly ham-handed. Hussain blows the introduction by being overeager, giving al-Akili reason to suspect Torres and Hussain are government agents. Hussain hands al-Akili his business card, and a suspicious al-Akili subsequently Googles the phone number. His search brings up an FBI document from the Newburgh Four case — one that I had obtained and posted online as part of a story for *Mother Jones*. The FBI had never bothered to change Hussain's cell phone number. Al-Akili discovers the story I wrote about Hussain — "The Making of an FBI Superinformant" — and realizes he's the target of an FBI investigation.

Instead of cowering, al-Akili emails dozens of lawyers and journalists, including me.

"I would like to pursue a legal action against the FBI due to their continuous harassment, and attempts to set me up," al-Akili wrote in the March 9, 2012 email.



What no one knew — not even the FBI — was that Cabral and Sutcliffe began filming al-Akili's side of things after he sent the email, which a lawyer who received it happened to forward to them. The documentary then becomes a house of mirrors, with each side of the FBI's counterterrorism operation being reflected onto the other, revealing a mash-up of damaged people being exploited by overzealous government agents, with no sign at all of anything resembling terrorism or impending danger to the public.

"I felt I was almost obligated to expose these guys," al-Akili told the filmmakers.

(T)ERROR becomes an intense spy game that plays out on screen, with each person double-crossing someone: Torres lying to and attempting to set up al-Akili for the FBI, and Cabral and Sutcliffe, in turn, turning the tables on the very subject of their film by approaching the subject of his investigation.

Cabral and Sutcliffe were even there when the FBI arrested al-Akili — not for terrorism but for having posed for a picture, in 2010, holding a rifle at a gun range. Since al-Akili had two previous felony drug convictions, he'd committed a crime by holding that gun. At his bond hearing, an FBI agent said Al-Akili had told informants that he wanted to join the Taliban in Pakistan. Al-Akili is now serving eight years in prison.

Near the end of (T)ERROR, Torres looks back on his work with the FBI agents in Pittsburgh.

"I told 'em," Torres recalls. "I said, 'I'm not here to entrap nobody.' They're trying to make me force this dude into saying something to support terrorism. I said, 'This dude is not a fucking terrorist, man. He's not even a pseudo-terrorist. He's nothing but an oxymoron.'"

*(T)ERROR* would be disturbing enough if the case it followed were an isolated one. But it's not. The announcement of a FBI sting like the one that targeted Khalifah al-Akili happens almost weekly now.

*Correction: An earlier version of this story incorrectly referred to Tarik Shah as a pianist; this story has been updated to reflect that he is a bassist.*

*Disclosure: Laura Poitras, a founding editor of The Intercept, was a creative consultant to the makers of (T)ERROR.*

*Photos and Video: Stories Seldom Seen*

Email the author: trevor@trevoraaronson.com



1
2                    **Declaration of Plaintiff**
3
4
5      I The Plaintiff **Edwin Cohens** have never been involved in any terrorist
6
7 activity what-so-ever. I have never met a terrorist,never had a conversation
8
9  with a terrorist. I have no plans to ever join a terrorist group in the future.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
28
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46

The Justice Department sent the plaintiff a  standard form for denying all

FOIA requests. The plaintiff wants the court to know this isn't a standard

FOIA request. The plaintiff's civil rights are being violated on a massive scale

daily. The F.B.I. is in violation of **42 U.S.C.sec 183, the Torture Victim**

**Protection Act(TVPA) 28 U.S.C. sec. 1350**This isn't just some

surveillance nonsense, they are actively trying to hurt him. They are in

violation of **Argravated Felony Rape with a foreign object, Intentional**

**Infliction of Emotional Distress, Argravated Battery,Assault** ....it goes

on and on and it;s all done **Under the Color of Authority.**

They are in violation of the United Nations Convention against Torture.

(CAT). They're violating international laws now.

The reason the F.B.I./Justice Department do not want to hand over

the plaintiff,s files is **1. The F.B.I. doesn't want the American people**

**to know they are involved in torture (2) The F.B.I doesn't want the**

**American people to know they're torturing an innocent American**

**citizen(3) The F.B.I. doesn't want the American people to know** they

**are torturing an American citizen on American soil.**

They plaintiff has given them the exact place to find the plaintiff's files

that is a roadmap from the F.B.I. own files, that was turned over by Edward

Snowden. The following pages are directly from the F.B.I. source and is

legal under *New York Times Co. v. United States,403 U.S. 713(1971)*



NEWS

# Barack Obama's Secret Terrorist-Tracking System, by the Numbers

By Jeremy Scahill and Ryan Devereaux   5 Aug 2014, 12:45 PM EDT

Nearly half of the people on the U.S. government's widely shared database of terrorist suspects are not connected to any known terrorist group, according to classified government documents obtained by *The Intercept*.

Of the 680,000 people caught up in the government's Terrorist Screening Database—a watchlist of "known or suspected terrorists" that is shared with local law enforcement agencies, private contractors, and foreign governments—more than 40 percent are described by the government as having "no recognized terrorist group affiliation." That category—280,000 people—dwarfs the number of watchlisted people suspected of ties to al Qaeda, Hamas, and Hezbollah combined.

The documents, obtained from a source in the intelligence community, also reveal that the Obama Administration has presided over an unprecedented expansion of the terrorist screening system. Since taking office, Obama has boosted the number of people on the no fly

14.

list more than ten-fold, to an all-time high of 47,000—surpassing the number of people barred from flying under George W. Bush.

"If everything is terrorism, then nothing is terrorism," says David Gomez, a former senior FBI special agent. The watchlisting system, he adds, is "revving out of control."



The classified documents were prepared by the National Counterterrorism Center, the lead agency for tracking individuals with suspected links to international terrorism. Stamped "SECRET" and "NOFORN" (indicating they are not to be shared with foreign governments), they offer the most complete numerical picture of the watchlisting system to date. Among the revelations:

• The second-highest concentration of people designated as "known or suspected terrorists" by the government is in Dearborn, Mich.—a city of 96,000 that has the largest percentage of Arab-American residents in the country.

• The government adds names to its databases, or adds information on existing subjects, at a rate of 900 records each day.

• The CIA uses a previously unknown program, code-named Hydra, to secretly access databases maintained by foreign countries and extract data to add to the watchlists.

A U.S. counterterrorism official familiar with watchlisting data told *The Intercept* that as of November 2013, there were approximately 700,000 people in the Terrorist Screening Database, or TSDB, but declined to provide the current numbers. Last month, the Associated Press, citing federal court filings by government lawyers, reported that there have been 1.5 million names added to the watchlist over the past five years. The government official told *The Intercept* that was a misinterpretation of the data. "The list has grown somewhat since that time, but is nowhere near the 1.5 million figure cited in recent news reports," he said. He added that the statistics cited by the Associated Press do not just include nominations of individuals, but also bits of intelligence or biographical information obtained on watchlisted persons.

When U.S. officials refer to "the watchlist," they typically mean the TSDB, an unclassified pool of information shared across the intelligence community and the military, as well as local law enforcement, foreign governments, and private contractors. According to the government's watchlisting guidelines, published by *The Intercept* last month, officials don't need "concrete facts" or "irrefutable evidence" to secretly place someone on the list—only a vague and elastic standard of "reasonable suspicion."

"You need some fact-basis to say a guy is a terrorist, that you know to a probable-cause standard that he is a terrorist," says Gomez, the former FBI agent. "Then I say, 'Build as big a file as you can on him.' But if you just suspect that somebody is a terrorist? Not so much."

The National Counterterrorism Center did not respond to questions about its terrorist screening system. Instead, in a statement, it praised the watchlisting system as a "critical layer in our counterterrorism defenses" and described it as superior to the pre-9/11 process for tracking threats, which relied on lists that were "typed or hand-written in card catalogues and ledgers." The White House declined to comment.



Most people placed on the government's watchlist begin in a larger, classified system known as the Terrorist Identities Datamart Environment (TIDE). The TIDE database actually allows for targeting people based on far less evidence than the already lax standards used for placing people on the watchlist. A more expansive—and invasive—database, TIDE's information is shared across the U.S. intelligence community, as well as with commando units from the Special Operations Command and with domestic agencies such as the New York City Police Department.

In the summer of 2013, officials celebrated what one classified document prepared by the National Counterterrorism Center refers to as "a milestone"—boosting the number of people in the TIDE database to a total of one million, up from half a million four years earlier.

The document credits that historic achievement to the Directorate of Terrorist Identities (DTI), a secretive and virtually unknown U.S. counterterrorism unit responsible for maintaining TIDE. "This number is a testament to DTI's hard work and dedication over the past 2.5 years," the document declares.

The number is also a testament to the Obama administration's intensified collection of personal information on individuals with suspected links to terrorism. In 2006, CBS News obtained a copy of the no fly list and reported that it included 44,000 names, including Bolivian President Evo Morales and the head of Lebanon's parliament. Faced with a widespread public backlash, the government cut the list down to just 4,000 names by late 2009.

The next year, after the so-called "underwear bomber" tried to bring down a commercial airliner bound for Detroit, Obama loosened the criteria for adding people to the no fly list. The impact was immediate. Since 2010, the classified documents note, the National Counterterrorism Center has "created more than 430,000 terrorism-related person records" while deleting only 50,000 people "whose nexus to terrorism was refuted or did not meet current watchlisting criteria." The documents reveal that more than 240 TIDE "nominations" are now processed each day.

"You might as well have a blue wand and just pretend there's magic in it, because that's what we're doing with this—pretending that it works," says former FBI agent Michael German, now a fellow at New York University's Brennan Center for Justice. "These agencies see terrorism as a winning card for them. They get more resources. They know that they can wave that card around and the American public will be very afraid and Congress and the courts will allow them to get away with whatever they're doing under the national security umbrella."



In the documents, the government emphasizes that it seeks to add only as many people to the TIDE list "as are necessary for our nation's counterterrorism mission." With hundreds of new nominations coming in every day, the numbers provide only a momentary snapshot of a watchlist system that is in constant motion.

An August 2013 slide from the National Counterterrorism Center called "TIDE By The Numbers" lays out the scope of the Obama administration's watchlisting system, and those it is targeting. According to the document, which notes that the numbers are "approximate," 680,000 people have been watchlisted, with another 320,000 monitored in the larger TIDE database. As of August 2013, 5,000 Americans were on the watchlist while another 15,800 were targeted in TIDE.

Among the other revelations in the documents:

• 16,000 people, including 1,200 Americans, have been classified as "selectees" who are targeted for enhanced screenings at airports and border crossings.

• There are 611,000 men on the main terrorist watchlist and 39,000 women.

• The top "nominating agencies" responsible for placing people on the government's watchlists are: the Central Intelligence Agency, the Defense Intelligence Agency, the National Security Agency, and the Federal Bureau of Investigation.

• The top five U.S. cities represented on the main watchlist for "known or suspected terrorists" are New York; Dearborn, Mich.; Houston; San Diego; and Chicago. At 96,000 residents, Dearborn is much smaller than the other cities in the top five, suggesting that its significant Muslim population—40 percent of its population is of Arab descent, according to the U.S. Census Bureau—has been disproportionately targeted for watchlisting. Residents and civil liberties advocates havefrequently argued the Muslim, Arab and Sikh communities in and around Dearborn are unfairly targeted by invasive law enforcement probes, unlawful profiling, and racism.

"To my knowledge, there have been no Muslims in Dearborn who have committed acts of terrorism against our country," Dawud Walid, executive director of the Michigan chapter of the Council on American-Islamic Relations, told *The Intercept*. Walid added that the high concentration of Dearborn residents in the watchlisting system "just confirms the type of engagement the government has with our community—as seeing us as perpetual suspects."



The documents also offer a glimpse into which groups the government is targeting in its counterterrorism mission. The groups with the largest number of targeted people on the main terrorism watchlist—aside from "no recognized terrorist group affiliation"—are al Qaeda in Iraq (73,189), the Taliban (62,794), and al Qaeda (50,446). Those are followed by Hamas (21,913) and Hezbollah (21,199).

Although the Obama administration has repeatedly asserted that al Qaeda in the Arabian Peninsula poses the most significant external terrorist threat to the United States, the 8,211 people identified as being tied to the group actually represent the smallest category on the list of the top ten recognized terrorist organizations. AQAP is outnumbered by people suspected of ties to the Pakistan-based Haqqani Network (12,491), the Colombia-based FARC (11,275,) and the Somalia-based al-Shabab (11,547).

The documents also reveal that as of last year, the U.S. had designated 3,200 people as "known or suspected terrorists" associated with the war in Syria. Among them were 715 Europeans and Canadians, as well as 41 Americans. Matt Olsen, the director of the National Counterterrorism Center, recently claimed that there are more than 12,000 foreign fighters in Syria, including more than 1,000 Westerners and roughly 100 Americans.



According to the documents, the government does much more than simply stop watchlisted people at airports. It also covertly collects and analyzes a wide range of personal information about those individuals –including facial images, fingerprints, and iris scans.

In the aftermath of last year's Boston Marathon bombing, the Directorate of Terrorist Identities began an aggressive program to collect biometric data and other information on all Americans on the TIDE list. "This project includes record by record research of each person in relevant Department of State and [intelligence community] databases, as well as bulk data requests for information," the documents note.

The DTI also worked on the subsequent Chicago Marathon, performing "deep dives" for biometric and other data on people in the Midwest whose names were on the TIDE list. In the process, the directorate pulled the TIDE records of every person with an Illinois, Indiana, or Wisconsin driver license.

DTI's efforts in Boston and Chicago are part of a broader push to obtain biometric information on the more than one million people targeted in its secret database. This includes hundreds of

thousands of people who are not watchlisted. In 2013, the directorate's Biometric Analysis Branch (BAB) launched an initiative to obtain biometric data from driver's license records across the country. At least 15 states and the District of Columbia are working with the directorate to facilitate access to facial images from driver's licenses. In fiscal year 2013, 2,400 such images were provided for inclusion in the secret TIDE database.

According to the documents, BAB offers its "unique skill of facial identification support" to a "broad customer base." Last year its analysts produced more than 290 reports for other government entities, including the CIA, the New York City Police Department, and the military's elite Special Operations Command.

All told, the classified documents show, the government compiles strikingly detailed dossiers of data on individuals who have been swept up in its databases. Though some of the documents obtained by *The Intercept* offer conflicting information on how much biometric data the government collects, the most detailed report shows that:

• In 2013, the main terrorism database included more than 860,000 biometric files on 144,000 people.

• The database contains more than a half a million facial images, nearly a quarter of a million fingerprints and 70,000 iris scans.

• The government maintains biometric data on people that it hasn't identified–TIDE contains 1,800 "BUPs," or "biometrics of unknown persons."

• In a single year, the government expanded its collection of "non-traditional" biometric data, including dramatic increases in handwriting samples (32 percent), signatures (52 percent), scars, marks, and tattoos (70 percent), and DNA strands (90 percent).



"We're getting into *Minority Report* territory when being friends with the wrong person can mean the government puts you in a database and adds DMV photos, iris scans, and face recognition technology to track you secretly and without your knowledge," says Hina Shamsi, director of the American Civil Liberties Union's National Security Project. "The fact that this information can be shared with agencies from the CIA to the NYPD, which are not known for protecting civil liberties, brings us closer to an invasive and rights-violating government surveillance society at home and abroad."

The DTI also goes far beyond accessing information from state driver's licenses. In managing the main terrorism database, the directorate coordinates with the CIA and the National Media Exploitation Center, a Pentagon wing responsible for analyzing and disseminating "paper documents, electronic media, videotapes, audiotapes, and electronic equipment" seized abroad in military or intelligence operations.

By sharing information with the military, the National Counterterrorism Center asserts, the DTI is able to "obtain additional data fusion points by accessing and exploiting NMEC data holdings." In return, the directorate "provides NMEC with a classified biometric search capability against TIDE through automated and manual facial identification support."

The DTI also harvests information from CIA sources, including a secret database called CINEMA— short for CIA Information Needs Management—and a secret CIA program called "Hydra," which utilizes "clandestinely acquired foreign government information" to enhance the quality of "select populations" in TIDE.

In 2013, DTI and the CIA ran a "proof of concept" for Hydra, using Pakistan as a guinea pig. The DTI provided the CIA with a list of 555 Pakistanis in the TIDE database. After

1
2      A country needs to know if their goverment is torturing its citizens.
3
4 *The records sought are ungently needed to inform the public about*
5
6 *actual or alleged government activity. These are serious allegations*
7
8 *that need to be checked out.*
9
10    This story is of general public interest and should be released under
11
12 32 C.F.R. sec. 1900.34(c)(2);28 C.F.R.sec.16.5(e)(1)(ii);32 C.F.R
13
14 sec. 286.4(d)(3)(ii)(A);22 C.F.R. sec. 171.12(b)(2)
15
16   The plaintiff understands the court,all well as the public will find
17
18 the use of these electronic devices confusing, which is all the more
19
20 reason  to grant this request. They are using these devices on an
21
22 innocent person and they need to be held accountable.
23
24    The plaintiff formally request a fee waiver under 5 U.S.C. sec. 552
25
26 (a)(4)(iii).
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48

*Erwin Cohens*

6-28-16

24.